## Breeding et al. v. Bentley, Judge, et al.

(Decided November 13, 1928.)

### Appeal from Letcher Circuit Court

1. Easements.—Presumption of grant of right of way by landowner, arising from long-continued use thereof by others, is strongly, if not conclusively, rebutted, where the way is over uninclosed woodland, in view of usual custom to travel over such property without asking owner's permission.
2. Easements.—Use of passway over creek bottom lands covered with timber and unfit for cultivation did not give rise to presumption of grant from landowner, where it was not shown that the use was adverse, and evidence indicated that landowner had given permission to use way.
3. Highways.—Where location of county road was changed and adjacent passway through creek bottom was obstructed, persons using way were entitled to require the old county road to be opened, where no written notice of adverse possession of road was given as required by Ky. Stats., sec. 2547.

JOE HALL and D. I. DAY for appellants.

F. G. FIELDS for appellees.

,OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

Previous to the year 1887 a county road in Letcher
county was located on the south side of Rockhouse creek.
In that year a change was made in the road at a point
about half a mile below the mouth of Elkhorn branch.
The road was changed so as to cross the creek at that
point and run around a hill on the north side of the creek
and come back to the old road on the south side of the
creek about 250 yards above the mouth of Elkhorn
branch. A road that was not established as a public road
ran up Elkhorn branch, and several families lived on this
branch. After this change was made in the public road,
the travel up Elkhorn branch, in the main, went up the
creek and on the south side of the creek for about 200
yards to a ford, there crossed the creek, and went up to
the county road on the north side of the creek. The land
on the north side of the creek was uninclosed woodland
and low so as to be often covered with water. Elijah
Breeding at that time owned the whole tract. After his
death it was divided among his children and G. W. Breed-
ing got the land on the north side of the creek. The old
county road on the south side of the creek from the mouth
of Elkhorn branch down to the point to where the change
was made was never discontinued by any order of the
county court. Henry Combs now owns this land, and the
proof for the plaintiffs is that he fenced up this road. On
the other hand, he says that it was fenced up when he
bought the property 22 years ago. In the year 1925, G.
W. Breeding set out his fence on the north side of the
creek so as to obstruct the passway as it was then used,
and those claiming the passway instituted a criminal
proceeding against him for obstructing it. He and his
vendee, W. R. Polly, then brought this action in equity to
enjoin the defendant from using the passway. They filed
an answer denying the allegations of the petition, alleg-
ing facts showing that they were entitled to the passway
and praying that they be adjudged the owners of it.
Proof was taken, and on final hearing the circuit court
entered judgment dismissing the petition and adjudging
that at the point in controversy there has been a pass-
way for many years, that the exact location of the pass-
way is involved in much doubt, but that the public has

such rights in the ingress and egress as to require a passway to be kept open to the public. The plaintiffs appeal.

Four families live up Elkhorn branch. The space from the lower ford to the upper ford is 160 feet; part of the time there was in the creek what was called an island, and they traveled over this island. But at other times they traveled farther back on the north side. Gradually the creek filled up on that side. The willows grew up, and there are now trees standing there some five to ten inches in diameter. There seems to have been no settled route for the passway. Breeding's fence set back some distance at that time, but he has moved it three times. The last time he put the fence practically on the bank of the creek with a view to cultivating the bottom, which is very valuable land for cultivation. As to how this travel began or under what right, John Combs, a witness for the defendant, testifies as follows:

> "Q. I will ask you if it isn't a fact that all the travel that you have done on this end of the bottom has not been done as a matter of permission, like neighbors sometimes do over certain people's lands?
>
> "A. Well I am not positive about it, but it seems that when they forced us over there, Breeding, I mean Elijah Breeding, that they said we would have to go that way to get out, that they was going to close that road. It is my impression that they had that conversation to my father.
>
> "Q. When you say they, who do you have reference to?
>
> "A. Elijah Breeding, the owner of the land at that time.
>
> "Q. Did Elijah Breeding own this bottom over which you are seeking to pass across the upper end, at that time
>
> "A. Yes, sir.
>
> "Q. Then you did get permission of Elijah Breeding to travel over this upper end of the bottom?
>
> "A. That is my impression, that he gave my father, or in other words they said we would have to go that way or no way. That is my remembrance about that talk to my father."

This evidence is wholly uncontradicted. In Bowman v. Wickliffe, 15 B. Mon. 98, the court thus stated the rule:

"It has been usual and customary in this state to travel over uninclosed woodland without asking the permission of the owner; and considering the extent and universality of this custom, it tends strongly, if not conclusively, to repel any presumption that might otherwise arise, in such a case, from long continued use of the grant of the right of way by the proprietor of the land. The mere use of this road, then, during the period of time that the land through which it passed was uninclosed woodland, can not be regarded as proving anything detrimental to the rights of the proprietors of the land."

In Wray v. Brown, 155 Ky. 761, 160 S. W. 490, the court said:

"A further distinction has been made between travel over uninclosed woodland by the public and travel over a well-defined way through inclosed or cultivated land, and this distinction should always be kept in mind when the facts bring the case within it. In other words, there is and ought to be a marked difference between the rights of the public claiming a passway when the travel has been for many years through open, uncultivated woodland and where it has been through inclosed or cultivated land. And so, too, there is and ought to be a marked distinction between the right of the owner of land to stop by inclosure or cultivation long continued travel through a woodland and to stop long continued travel through inclosed or cultivated land. There are few owners of uninclosed woodland who pay any attention to the amount of travel over it or through it. The travel does not do any harm to the land or interfere with the interests of the owner; but when there is much travel through inclosed or cultivated land it is, as a rule, a serious inconvenience as well as source of annoyance to the owner, and injury to his property. It would seem, therefore, that when an owner permits the public for a long number of years to travel through his cultivated or inclosed lands without attempting to interfere with the use,

his action implies his consent to the use, while the mere fact that he permits the public to travel at liberty through uninclosed woodland might not raise any presumption of a grant.''

These cases were followed and approved in Winlock v. Miller, 167 Ky. 717, 181 S. W. 330; Davidson v. Nantz, 177 Ky. 50, 197 S. W. 520; Smith v. Oliver, 189 Ky. 214, 224 S. W. 683; Stephens v. Hamblin, 195 Ky. 428, 242 S. W. 597.

It is insisted for the appellees that in O'Daniel v. O'Daniel, 88 Ky. 185, 10 S. W. 638, it was held that the use of a passway, even through woodland, would be presumed adverse after many years unless the use was shown to be permissive, and that that case has been followed in many cases since. This is true, but in that case the road had been used over 50 years, and there were circumstances showing that it was used as a matter of right. The same is true in other cases in which this rule has been applied. How the use of the passway originated is clearly shown here. It originated after the road was changed, and plainly for a long time much of the travel at times went down the old county road on the south side of the creek. The land was a creek bottom, in timber, and unfit for use at that time. As the bottom filled in, Breeding set out his fence from time to time. There is no evidence of an actual adverse use, and not to apply here the rule laid down in the cases cited would be practically to hold that the rule there declared has no application any longer.

The people living on the branch, so far as the proof shows, are not without remedy, if the way in the bed of the creek is insufficient. They have only to require the county road opened on the south of the creek. Section 2547, Kentucky Statutes, provides:

"Limitation shall not begin to run in favor of any person in the possession of any public road, or of any part thereof, until written notice shall be given to the county court of the county in which the road is situated, that such possession is adverse to the right of the public to the use of such road."

Judgment reversed, and cause remanded for a judgment as above indicated.